# Illinois Official Reports

## Appellate Court

---

*In re Marriage of Chez*, 2013 IL App (1st) 120550

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF KATHERINE L. CHEZ, Petitioner-Appellee, and RONALD L. CHEZ, Respondent-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-12-0550 |
| Filed | November 26, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In dissolving the parties' marriage, the trial court did not err in finding that the joint property provision of the parties' premarital agreement was clear and unambiguous to the extent that it required an equal distribution of the proceeds of the sale of their joint property with no reimbursement for costs paid by either party, and any testimony of petitioner concerning her oral agreement to repay her portion of the down payment for one jointly held property was irrelevant in view of the provision of the premarital agreement requiring any amendments to be made in writing. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 06-D-5490, 06-CH-4412 cons.; the Hon. Thomas J. Kelly and the Hon. William S. Boyd, Judges, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Schwartz & Kanyock, LLC, of Chicago (Andrew R. Schwartz, Thomas Kanyock, and Karen I. Jeffreys, of counsel), for appellant.

Gozdecki, Del Giudice, Americus & Farkas, LLP (Richard A. Del Giudice and Jeffery M. Heftman, of counsel) and William P. White III, Ltd. (William P. White III, of counsel), both of Chicago, for appellee.

Panel

JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Quinn and Justice Pierce concurred in the judgment and opinion.

## OPINION

¶ 1    Respondent, Ronald L. Chez, appeals the order of the circuit court entering judgment on the dissolution of his marriage to petitioner Katherine L. Chez (now known as Katherine Malkin). On appeal, Ronald contends that the trial court (1) erred in finding that the joint property provision of the parties' premarital agreement was clear and unambiguous, where the agreement was silent on how to apportion costs when distributing joint property upon dissolution of marriage; and (2) abused its discretion in allowing Katherine to testify in contradiction to her prior judicial admissions regarding the parties' Carmel property. For the following reasons, we affirm.

¶ 2                                  JURISDICTION

¶ 3    The trial court entered the judgment for dissolution of marriage on August 5, 2009. Both parties moved to reconsider which the trial court resolved on October 14, 2009. Ronald filed a motion for sanctions on October 15, 2009, and the trial court entered an order on the motion on January 20, 2012. On February 17, 2012, Ronald filed his notice of appeal. This court has jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303 governing appeals from final judgments entered below. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. May 30, 2008).

¶ 4                                  BACKGROUND

¶ 5    Ronald and Katherine were married on April 17, 1993. At the time of marriage, Ronald was a successful investor of public and private companies, and Katherine worked as a successful real estate broker. Each had been married before and had children from their prior marriages.

¶ 6    On April 14, 1993, prior to their marriage, Ronald and Katherine entered into a premarital agreement (PMA). The PMA stated that it represented the parties' "desire to fix and determine the rights and claims that will accrue to them, respectively, in the estate and property of the

other by reason of their marriage and to accept the provisions hereof in lieu of and in full discharge, settlement and satisfaction of all such rights and claims."

¶ 7 Ronald and Katherine agreed, "[e]xcept as expressly provided otherwise in the following provisions of this Agreement," that each party "shall control and manage [his or her] Separate property" at his or her own discretion. In the PMA, "Separate property" included:

"(a) The beneficial interests and assets of the respective parties prior to the marriage contemplated under this Agreement, including those listed on the attached Exhibits 'A' and 'B', which beneficial interests and assets constitute the property either now owned by such party or in which such party now has a beneficial interest;

(b) Any property acquired by the respective parties after the marriage contemplated under this Agreement by gift, bequest, devise, descent or exercise of power of appointment, whether or not such acquired property shall be outright or in trust;

(c) The respective parties' non-marital property denominated as such by the Illinois Marriage and Dissolution of Marriage Act, Section 503(a) (Ill. Rev. Stat. Ch. 40, Section 503(a)) as in effect at the date hereof;

* * *

(f) Any property acquired subsequent to the date of this Agreement and placed in the name of one of the parties shall be in the Separate Property of the party so named.

(g) Any property designated as either party's Separate Property by the valid agreement of the parties."

The PMA also provided that "no property of the parties shall be treated as marital property within the meaning of Illinois law or similar statutes or community property or quasi-community property law of any other jurisdiction in which the parties, or either of them, shall be domiciled or reside. There shall exist a presumption that there is no unintentional creation of marital property or unintentional transmutation of Separate property into marital property."

¶ 8 Upon dissolution of the marriage, the PMA provided that "neither [Katherine nor Ronald] shall have the right to support, maintenance, alimony, equitable distribution, special equity, or any interest of any kind in the Separate Property of the other, and each of the parties shall be entitled to his or her own Separate Property." The PMA also provided that "[u]nless the parties agree otherwise in writing to the contrary, any account or other property as to which the parties take title in joint tenancy, tenancy by the entirety or tenancy in common shall be hereinafter referred to as 'Joint Property' and all proceeds of sale of, property acquired in exchange for, increase in value of, income from, gains generated by and distributions of Joint Property shall also be Joint Property. In the event of a dissolution of the parties' marriage, all Joint Property shall be divided equally between the parties."

¶ 9 The PMA expressly stated that it "contains the entire understanding of the parties hereto. No representations, warranties, promises, covenants or undertakings, written or oral, other than those expressly herein set forth shall be binding on the parties hereto. The validity, enforceability, interpretation and administration of this agreement shall be determined under the laws of Illinois." During the dissolution proceedings, the parties agreed that the PMA reflected their intent to opt out of the Illinois Marriage and Dissolution of Marriage Act (the

Marriage Act) (750 ILCS 5/101 *et seq*. (West 2006)) and waive their marital rights against the property of the other spouse.

¶ 10    Ronald and Katherine engaged in a number of successful real estate investments prior to and during their marriage. These investments were generally titled in Ronald's name only. The parties' personal residences, including their Chicago, Illinois, residence (Astor) and their California vacation home (Carmel) were titled in joint tenancy.

¶ 11    On March 7, 2006, Ronald filed a three-count complaint in chancery court seeking a declaration that the parties invested in three properties (including Astor and Carmel) as joint ventures, and to compel the sale and distribution of proceeds from the properties according to the terms of the oral joint venture. Ronald argued that in the joint ventures, the parties agreed that the acquisition, carrying costs and maintenance of the properties would be recouped upon sale with the remaining proceeds split equally between the parties. Katherine filed a petition for dissolution of marriage on May 17, 2006, and the trial court subsequently consolidated the two cases.

¶ 12    Both parties filed summary judgment motions. While Ronald sought to characterize Carmel and another property as joint ventures, Katherine sought a declaration that Carmel and Astor were joint properties within the meaning of the PMA. On June 3, 2008, the trial court granted Katherine's motion and denied Ronald's motion. It determined that the Carmel and Astor properties were joint properties within the meaning of the PMA because they were titled in joint tenancy. It also found no evidence that the parties entered into an oral joint venture agreement regarding any of the properties in question.

¶ 13    Ronald filed a claim for contribution on June 18, 2008. Katherine filed an answer asserting the affirmative defense of conversion, arguing that Ronald converted jointly owned property for personal use and therefore could not recover for contribution. Ronald moved to strike this defense as insufficient in law, but the trial court denied Ronald's motion.

¶ 14    On August 5, 2009, the trial court issued its judgment for dissolution of marriage and denied Ronald's contribution claim. The trial court acknowledged that although the PMA did not expressly address how to divide expenses paid on joint properties, it was unambiguous, it did not provide for contribution claims against either party's interest in joint properties, and it clearly disposed of joint property based solely upon title rather than the parties' contributions to the properties. The parties filed motions to reconsider, and the trial court denied Katherine's motion and granted Ronald's in part. However, it left intact its determination as to the Astor and Carmel properties at issue in this appeal. Ronald filed a motion for sanctions which the trial court finally resolved on January 20, 2012. Ronald filed this timely appeal.

¶ 15                                        ANALYSIS

¶ 16    On appeal, Ronald contends that the trial court erred in determining that the parties' PMA was unambiguous and that its clear terms required the equal distribution of proceeds from the sale of joint property, with no reimbursement for costs paid by either party. Premarital agreements are contracts and, as such, the rules governing contract interpretation apply. *In re Marriage of Best*, 387 Ill. App. 3d 948, 949 (2009). The primary objective of contract interpretation is to ascertain the intent of the parties. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232-33 (2007). In determining the parties' intent, courts must view the contract as a whole and

not focus on isolated terms or provisions. *Id*. at 233. If the language of the contract is clear and unambiguous, the intent of the parties is ascertained solely from the words of the contract, given their plain and ordinary meanings. *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 556 (2007).

¶ 17    A contract is ambiguous, however, if it is susceptible to more than one reasonable interpretation. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). The mere fact that the parties disagree on the interpretation of a contract term does not render the term ambiguous. *William Blair & Co. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 334 (2005). Absent ambiguity, courts must interpret a contract by its clear language and not according to the parties' subjective interpretations. *Id*. at 335. Whether a contract is ambiguous is a question of law reviewed *de novo*. *Cincinnati Insurance Co. v. Gateway Construction Co.*, 372 Ill. App. 3d 148, 151 (2007).

¶ 18    Ronald and Katherine were successful professionals in their respective fields prior to their marriage. Each had been married previously and had children from their prior marriages. Both had accumulated property and assets, and by entering into the PMA, they sought to address the legal effect their marriage would have on those assets. The PMA expressly states that it reflects the intent of Ronald and Katherine "to fix and determine the rights and claims that will accrue to them, respectively, in the estate and property of the other by reason of their marriage and to accept the provisions hereof in lieu of and in full discharge, settlement and satisfaction of all such rights and claims." Furthermore, the PMA "contains the entire understanding of the parties hereto. No representations, warranties, promises, covenants or undertakings, written or oral, other than those expressly herein set forth shall be binding on the parties hereto."

¶ 19    The PMA states that Ronald and Katherine agree that each "shall control and manage [his or her] Separate Property *** at [his or her] own discretion." The agreement then defines "Separate Property" as including property the parties owned prior to marriage and the parties' nonmarital property as defined in section 503(a) of the Marriage Act. As for property acquired after the marriage, separate property includes any property acquired by gift, bequest, devise, descent or by appointment, or property placed in the name of one of the parties. They agreed that "no property of the parties shall be treated as marital property within the meaning of Illinois law" and a presumption exists "that there is no unintentional creation of marital property or unintentional transmutation of Separate Property into marital property." In effect, Ronald and Katherine agreed to opt out of coverage under the Marriage Act and to set their own rules governing their property.

¶ 20    Section 7 of the PMA provides for the distribution of property upon dissolution of the parties' marriage. It provides that neither Ronald nor Katherine "shall have the right to support, maintenance, alimony, equitable distribution, special equity, or any interest of any kind in the Separate Property of the other, and each of the parties shall be entitled to his or her own Separate Property." Section 7 also addresses the distribution of another type of property the parties may acquire during marriage: joint property. This section contains the only reference to joint property found in the PMA. It states:

> "Unless the parties agree otherwise in writing to the contrary, any account or other property as to which the parties take title in joint tenancy, tenancy by the entirety or tenancyin common shall be hereinafter referred to as 'Joint Property' and all proceeds of sale of, property acquired in exchange for, increase in value of, income from, gains

generated byand distributions of Joint Property shall also be Joint Property. *In the event of a dissolution of the parties' marriage, all Joint Property shall be divided equally between the parties.*" (Emphasis added.)

¶ 21    According to the plain terms of the PMA, upon dissolution of their marriage, Ronald and Katherine retain ownership and control over their separate property and any proceeds stemming from that property. However, any joint property "shall be divided equally between the parties." The trial court below determined that the Carmel and Astor properties at issue here were joint properties within the meaning of the PMA because they were titled in joint tenancy. Therefore, it distributed the properties equally between Ronald and Katherine upon dissolution of their marriage. We find no error in the trial court's determination.

¶ 22    Ronald, however, argues that he should be reimbursed for the costs he paid from his separate property toward the joint properties before distribution of the joint properties. He points out that the PMA does not address the issue of cost reimbursement for the joint properties and therefore we must look to Illinois law governing joint tenancy and the rights of joint tenants and co-debtors to contribution. Ronald does not provide authority to support his contention.

¶ 23    Instead, general contract law in Illinois provides that if a contract purports on its face to be the complete agreement between the parties, courts should not add terms about which the agreement is silent. *Schuch v. University of Chicago*, 87 Ill. App. 3d 856, 859 (1980). The PMA states that it "contains the entire understanding of the parties hereto. No representations, warranties, promises, covenants or undertakings, written or oral, other than those expressly herein set forth shall be binding on the parties hereto." The PMA states simply that upon dissolution of Ronald and Katherine's marriage, "all Joint Property shall be divided equally between the parties." The agreement has no provision for the reimbursement of costs paid toward joint property prior to distribution. This court will not add terms to an otherwise clear and complete agreement between the parties. *Id.*

¶ 24    Ronald also argues that he should be reimbursed for his costs pursuant to his common-law contribution rights as a joint tenant and spouse. He contends that the trial court erred in dividing Carmel and Astor equally "without regard for the parties' widely differing investments" in the properties. He argues that "Katherine did not pay her fair share, and she must now reimburse Ronald to 'equalize' her obligations with her benefits. Otherwise, she is unjustly enriched at Ronald's expense, and he is treated unequally." He contends that since this right of contribution arises outside of marriage, it is not governed by the PMA nor could the PMA eliminate this right. Ronald's brief cites to numerous cases holding that common-law contribution rights as to property held in joint tenancy apply to spouses as well as to unmarried parties.

¶ 25    However, a husband and wife may, "by agreement, exclude the operation of law and determine for themselves what rights they will have in each other's property." *In re Marriage of Burgess*, 123 Ill. App. 3d 487, 489 (1984). In fact, the Marriage Act expressly recognizes that the parties may, by agreement, exclude the operation of marital property laws. See 750 ILCS 5/503(a)(4) (West 2010). The PMA states that it represents the parties' "desire to fix and determine the rights and claims that will accrue to them, respectively, in the estate and property of the other by reason of their marriage and to accept the provisions hereof in lieu of and in full discharge, settlement and satisfaction of all such rights and claims." The parties here chose to

exclude the operation of law and to determine for themselves their respective property rights that would accrue to them by reason of their marriage. The PMA does not state that common-law contribution rights apply in the distribution of joint property upon dissolution of marriage. Rather, it states that its provisions should be taken "in lieu of and in full discharge" of all common-law marital property rights and claims. The PMA provides only that joint property would be equally divided between the parties with no mention of costs or from whose funds the purchase of the joint property originated. We are not persuaded by Ronald's argument.

¶ 26    Ronald also takes issue with the trial court's alternative ruling that even if the Marriage Act did apply to the joint property issue here, the equities lie with Katherine when dividing joint debt and/or expenses. As discussed above, we have determined that the terms of the PMA are clear and unambiguous. We need not address whether the trial court erred in making an alternative ruling based upon the Marriage Act because we find that by entering the PMA the parties opted out of having the Marriage Act govern their property issues. A reviewing court may affirm the trial court's judgment on any basis appearing in the record, regardless of whether the trial court relied on that basis or whether the trial court's reasoning was correct. *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 204 (2007).

¶ 27    Ronald's final contention is that the trial court improperly admitted Katherine's trial testimony regarding payments relating to Carmel which contradicted her earlier judicial admissions. He refers to testimony Katherine gave on September 8, 2008, in which she discussed how she would pay her share of the down payment on the Carmel property and that Ronald never told her he expected Katherine to pay back his costs. However, Ronald states that Katherine's Illinois Supreme Court Rule 216 (eff. May 1, 2013) admissions included statements that Ronald advanced her share of the Carmel down payment and that she agreed to repay him. He argues that the trial court's admission of Katherine's September 8, 2008, testimony contradicting her Rule 216 admissions warrants reversal. See *Moy v. Ng*, 371 Ill. App. 3d 957, 960-61 (2007) (Rule 216 admissions are incontrovertible and effectively withdraw a fact from contention).

¶ 28    Whatever error may have occurred here, however, does not affect our decision. The trial court did not admit Katherine's testimony unconditionally. The transcript of the proceeding shows that when Katherine started to testify on this issue, Ronald's counsel objected arguing that the issue was covered in the Rule 216 requests. The trial court allowed the testimony, reasoning that it wanted to see what questions would be asked, and if her answers specifically contradicted any Rule 216 admissions, it would allow a motion to strike. The briefs do not state that Ronald filed a motion to strike, nor do they point to the record where the motion can be found.

¶ 29    Finally, we have determined that the joint tenancy provision of the PMA is clear and unambiguous. The joint tenancy provision of the PMA specifically states that "[u]nless the parties agree otherwise in writing to the contrary, any *** property as to which the parties take title in joint tenancy *** shall be hereinafter referred to as 'Joint Property' and upon dissolution of marriage, "all Joint Property shall be divided equally between the parties." Any testimony regarding payments related to the Carmel property, however, referred to oral agreements allegedly made by the parties. The provision requires that any agreements made between the parties that amend the clear meaning of joint property must be in writing.

Therefore, Katherine's testimony regarding any oral agreements is not relevant to the interpretation of the PMA.

¶ 30        For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 31        Affirmed.